IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| **JANIQUE SANDERS** | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 3:25-cv-1017 |
| v. | ) |
| | ) |
| **UNIVERSITY OF NORTH,** | ) **JURY TRIAL DEMANDED** |
| **CAROLINA-CHARLOTTE;** | ) |
| **KAREN SHAFFER; and** | ) |
| **FRANK FLEMING, in their** | ) |
| **individual capacities,** | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff **Janique Sanders** ("Plaintiff" or "Sanders"), by and through her undersigned attorneys, HKM Employment Attorneys LLP, brings this civil rights action for relief and damages against Defendants **University of North Carolina-Charlotte**; Karen Shaffer and Frank Fleming, in their individual capacities, based on the following factual allegations and causes of action.

## PRELIMINARY STATEMENT

1. Plaintiff Sanders, an African-American woman, was once employed in the office of Identity, Equity, and Engagement at the University of North Carolina-

Charlotte ("UNCC"). When the political pendulum in North Carolina and nationally swung in a different direction, Sanders' department was reorganized and parts of its mission were shuttered. Other aspects of what is commonly called "diversity, equity, and inclusion" ("DEI") work remained intact.

2. In the fall of 2024, a conservative advocacy group that calls itself Accuracy in Media ("AIM") targeted Sanders for one of its periodic "sting" videos, where unsuspecting employees are videotaped making comments that AIM believes reflect their employer's liberal agenda. Approximately six months later, AIM posted online its sting of Sanders commenting on the continued vitality of DEI work at UNCC, a purpose AIM despises.

3. Within 24 hours, Sanders was fired by UNCC's Associate Vice Chancellor of Student Affairs Karen Shaffer and its Executive Director of Student Affairs Frank Fleming for her exercise of her rights as an American citizen to speak on a matter of controversy and public concern.

4. In this lawsuit, Sanders alleges under 42 U.S.C.A. § 1983 that her termination for free speech by Shaffer and Fleming violates the First Amendment of the United States Constitution. Sanders also asserts a cause of action under the mixed motive provision of Title VII of the Civil Rights Act of 1964 on the grounds that her firing reflects an impermissible injection of racial bias into an employment decision.

2

5. Sanders seeks economic damages against UNCC, Shaffer, and Fleming including back pay and front pay, as well as lost benefits; noneconomic compensatory damages; and attorneys' fees and costs of litigation.

## PARTIES

6. Sanders is a resident of the State of North Carolina and was at all times relevant to this complaint employed by UNCC.

7. UNCC is a public university within the University of North Carolina system and is located in Mecklenburg County.

8. UNCC is subject to suit under Title VII for unlawful employment practices.

9. Defendant Shaffer is the Associate Vice Chancellor of Student Affairs of UNCC and was a decisionmaker regarding Sanders' termination. Shaffer is subject to suit in her individual capacity under § 1983 for a violation of Sanders' right to free speech under the First Amendment that was perpetrated under color of state law.

10. Defendant Fleming is the Executive Director of UNCC's Office of Student Affairs and was a decisionmaker regarding Sanders' termination. Fleming is subject to suit in his individual capacity under § 1983 for a violation of Sanders' right to free speech under the First Amendment that was perpetrated under color of state law.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

11. Sanders filed a charge of race discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 430-2025-04470, on August 20, 2025.

12. Sanders subsequently received a Right-to-Sue letter from the EEOC on September 29, 2025. A copy is attached as Exhibit A.

13. Sanders timely files her Title VII claim against UNCC within 90 days of receiving her Right-to-Sue letter.

## JURISDICTION

14. The Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1343(a)(4) and 28 U.S.C. § 1331 (federal question).

## VENUE

15. Pursuant to 28 U.S.C. § 1391(b)(1), the Western District of North Carolina is the proper venue for the filing and prosecution of this action in that Defendants in this case have a principal place of business in the Western District of North Carolina and because the employment practices and other conduct alleged to be unlawful occurred in this district.

# FACTUAL ALLEGATIONS

16. Sanders grew up in Newark, New Jersey; after moving to the Charlotte area in 2011, she attended UNCC for one year. She transferred to Rutgers University where she graduated Phi Beta Kappa in 2017. She is a member of the Alpha Kappa Alpha sorority and obtained a masters of Public Administration at Rutgers in 2019.

17. Sanders spent two years working at Rutgers in the broad field of equity and outreach to campus communities. Her various roles included facilitating interactive dialogue on social justice concerns, advising student affinity groups, and supervising teams of federal work study students.

18. In March 2021, Sanders returned to Charlotte and joined UNCC's office of Identity, Equity, and Engagement. ("IEE"). She was named UNCC's Assistant Director of Experiential and Equity Initiatives.

19. Sanders' job focused on institutional programs that sought to engage students who were part of marginalized economic, ethnic, and social communities. The goal was to replace alienation and conflict with a sense of shared community.

20. Sanders was part of UNCC's umbrella of DEI initiatives, which emerged in the aftermath of a racially turbulent time in American history: notorious incidents in which two Black Americans, Breonna Taylor and George Floyd, were victims of what were widely regarded as excessive and

5

disproportionate uses of deadly force by law enforcement.

21. For a brief season, the UNC system's DEI agenda was a subject of bipartisan and corporate praise and aligned with a national trend of expanding closed circles of leadership: black women were elevated to the United States Supreme Court and the position of Vice President of the United States, and scores of persons of color and diverse social identities were appointed to the federal judiciary.

22. The tide moved dramatically in a different direction in 2023 and 2024 in North Carolina and the country. The University of North Carolina's policy of treating racial diversity as a positive factor in its admissions calculus was struck down by the Supreme Court. That ruling and a companion decision against Harvard University spawned a genre of imitator lawsuits aimed at attacking hiring practices in the private sector, the award of racially themed grants and scholarship to students and entrepreneurs, and even the admissions process at America's military academies.

23. The UNC system's Board of Governors voted in May 2024 to repeal its official DEI policy and to replace it with a vaguely described stance of "institutional neutrality" regarding the value of racial diversity. In the same vein, the Board issued guidance to its administrators that offices and programs that promoted DEI initiatives needed to be closed.

24. Sanders' IEE department was one of the programs targeted for closure. UNCC replaced IEE with a newly minted Center for Leadership and Community

6

Engagement ("CLCE"). Sanders' specific role was rebranded as Assistant Director of Civic Engagement and Experiential Learning.

25. Sanders' department, despite its former mission, was primarily staffed and led by white employees who retained their role and a white female rather than Sanders was named to the new position of Associate Director of CLCE.

26. Sanders was not in any manner a policy maker and had no formal or informal responsibility for conceiving CLCE's mission or its legitimate scope of duties in the aftermath of the anti DEI backlash.

27. The leadership of Sanders' department expressed in internal meetings a desire to preserve core aspects of its prior mission without running afoul of the Board of Governors' anti-DEI mandate. In Sanders' case, while she was no longer permitted to act as a liaison to campus groups organized based on social or ethnic identity, she was permitted to continue off campus collaborations with organizations that aligned with social justice and to devote time and resources to subjects of economic empowerment and civic participation.

28. In the October/November 2024 time frame, while working in her office, Sanders was approached by two individuals, one of whom was white and the other was white or Hispanic, who inquired about available job opportunities in her department. They expressed that they wanted to work specifically on DEI initiatives.

7

29. Sanders became involved in a conversation with these individuals that lasted between five and ten minutes. She told them that DEI was no longer a recognized programmatic space at UNCC. Sanders sought instead to steer them to pursuing opportunities related to community service projects, for example a partnership between UNCC and Charlotte food banks.

30. Sanders went on to express her personal viewpoint that while DEI had been abandoned as a matter of policy in the UNC system, its original values ought to remain vital parts of campus life. As she put it at one point, "We've renamed…reorganized..recalibrated..because language changes, right? But the people who have to be in the presence of and in the space don't change."

31. Sanders continued by stating that she believed what one of the individuals labeled "equity work" was still happening at UNCC but that she believed she "was not allowed" to overtly say so. She further expressed her opinion that knowledge of diverse communities should remain a central tool of leadership and was integrally connected to ensuring a constructive learning environment for students.

32. In November 2024, Donald J. Trump was elected President of the United States for the second time, defeating the black female Vice President Kamala Harris. Trump's relatively thin margin in the popular vote translated to a resounding

win in the Electoral College, including a victory in North Carolina, a state that former President Barack Obama had won a political generation earlier.

33. President Trump unfurled a fusillade of executive orders in his first weeks back in the White House. One of them officially eradicated federal DEI policies and prohibited educational institutions from engaging in DEI work. The President has overhauled the leadership and agenda of various federal civil rights agencies and his Department of Justice has pursued and threatened to pursue federal lawsuits against organizations who continue to promulgate policies that endorse the strengthening of racial diversity.

34. On the evening of May 28, 2025, Sanders received a text message from Karen Shaffer, UNCC's Associate Vice Chancellor of Student Affairs, with a link to a video and audio recording that had been posted that same day on social media by an organization that labels itself Accuracy in Media.

35. The video contained selective excerpts of the aforementioned conversation between Sanders and two individuals who purported to seek jobs in Sanders' department in October or November 2024. It turns out that these supposed job seekers were operatives for AIM who had recorded the exchange on their phones without Sanders' consent.

36. AIM does not practice UNC's current stance of "institutional neutrality" on subjects of racial controversy. AIM has launched a campaign to

9

secretly record campus administrators endorsing DEI values in an effort to foment opposition to any vestiges of advocacy of racial diversity; rather than follow the ethical imperative that journalists reveal themselves and their news outlets, AIM's sting operatives pretend to be empathetic citizens soliciting their target's views.

37. AIM has not shown in its decades long history any comparable zeal or interest in targeting for exposure individuals who harbor racist or misogynistic views.

38. AIM and its ideological counterparts regard racial diversity as a device to elevate racial minorities in the workforce at the expense of whites. That belief, in turn, is often informed by an assumption that the rise of minorities in leadership roles is unconnected to merit and derives instead from an unfair edge in the form of quotas.

39. Sanders verified to Associate Vice Chancellor Shaffer that the images in the video were not AI generated or fabricated. Later that evening, Shaffer called Sanders a second time to inform her that UNCC would need to conduct an investigation of the circumstances around the recording.

40. The next day, May 29, instead of being questioned by an internal investigator, Sanders was informed by Shaffer and Frank Fleming, the Executive Director of UNCC's Division of Student Affairs, that they had decided to immediately terminate her.

41. Sanders was not provided with specific grounds for her firing and Shaffer and Frank did not articulate to her any provision of UNCC's policies that Sanders violated.

42. In a press interview, a communications official at UNCC acknowledged that Sanders "had no policy making authority, no role in compliance matters", and that her comments in the AIM video were not made within the purview of her job.

43. While UNCC's spokesperson alluded to an internal review that preceded Sanders' firing, the "review" lacks any hallmarks of genuine investigation. Sanders was not interviewed or asked to provide a defense or rationale for her taped comments.

44. Upon information and beliefs, UNCC did not seek and has never obtained the entire footage of AIM's recording of Sanders. While it is unknown to Sanders whether UNCC interviewed her supervisors or the leadership in her department about whether their views align with Sanders, UNCC's public comments have only stated that the university would endeavor to ensure its employees followed federal law.

45. There is no evidence or reporting that suggests that UNCC attempted to ascertain whether other non-black officials in Sanders' department have made

comments similar to Sanders' viewpoint or to determine the forum in which any similar comments were made; or that UNCC analyzed whether AIM's conduct itself reflects a racially biased agenda.

46. Race was at least a motivating factor in UNCC's termination of Sanders, in that the university ratified or condoned AIM's actions that are at least partially ringed by racially biased assumptions.

47. It is atypical at UNCC to terminate individuals with no disciplinary history for a first offense violation of policy, assuming without proof that UNCC actually believed Sanders violated a concrete campus policy or rule.

## CAUSES OF ACTION

## COUNT I

**(against Defendant University of North Carolina-Charlotte)**

**(mixed motive discrimination in violation of 42 U.S.C. §§ 2000e-2(m))**

48. Plaintiff realleges and incorporates the factual allegations herein as if set forth in their entirety.

49. UNCC's termination of Plaintiff gave impermissible weight to the actions of an external entity that were driven in part by opposition to racial diversity initiatives on behalf of Black Americans.

50. UNCC's termination also singled out Sanders without endeavoring to determine if the viewpoints she expressed reflected the perspective of other employees in her academic program who were outside of her protected class.

51. As a result, UNCC's actions reflect the impermissible consideration of race as a motivating factor in the decision to terminate Sanders.

52. As a result of UNCC's discriminatory conduct, Plaintiff has suffered economic damages, including lost wages and benefits; compensatory damages, including emotional pain and suffering; and embarrassment and humiliation. Plaintiff is also entitled to recover her attorney's fees and costs as permitted by law.

## COUNT II

**(against Karen Shaffer, in her individual capacity)**

**(First Amendment Retaliation, in violation of 42 U.S.C.A. § 1983)**

53. Plaintiff realleges and incorporates the factual allegations herein as if set forth in their entirety.

54. Plaintiff's expression of views championing the continued necessity for diversity, equity, and inclusion policies at UNCC were spoken outside the scope of her job and scope of authority.

55. Plaintiff's comments impinged on a matter of public concern, the ongoing debate over the legality as well as the social and economic value of racial diversity in educational institutions.

56. Shaffer's failure to articulate a rule violation on Plaintiff's part or an actual breach of the Board of Governors' anti-DEI directives indicate that UNCC's legitimate interests did not outweigh Plaintiff's constitutional interest in free speech.

57. Plaintiff's exercise of her free speech rights was a but-for cause of her termination by Defendant Shaffer.

58. Defendant Shaffer's unconstitutional acts occurred under color of state law, were within the exercise of her discretionary authority, and violated Plaintiff's clearly established right to be free from retaliation for the exercise of her First Amendment rights.

59. As a direct and proximate result of Defendant Shaffer's unconstitutional conduct, Plaintiff has suffered economic damages, including lost wages and benefits; compensatory damages, including emotional pain and suffering; and embarrassment and humiliation. Plaintiff is also entitled to recover her attorney's fees and costs as permitted by law.

## COUNT III

**(against Frank Fleming, in his individual capacity)**

**(First Amendment Retaliation, in violation of 42 U.S.C.A. § 1983)**

60. Plaintiff realleges and incorporates the factual allegations herein as if set forth in their entirety.

61. Plaintiff's expression of views championing the continued necessity for diversity, equity, and inclusion policies at UNCC were spoken outside the scope of her job and scope of authority.

62. Plaintiff's comments impinged on a matter of public concern, the ongoing debate over the legality as well as the social and economic value of racial diversity in educational institutions.

63. Fleming's failure to articulate a rule violation on Plaintiff's part or an actual breach of the Board of Governors' anti-DEI directives indicate that UNCC's legitimate interests in efficient administration did not outweigh Plaintiff's constitutional interest in free speech.

64. Plaintiff's exercise of her free speech rights was a but-for cause of her termination by Defendant Fleming.

65. Defendant Fleming's unconstitutional acts occurred under color of state law, were within the exercise of his discretionary authority, and violated Plaintiff's clearly established right to be free from retaliation for the exercise of her First Amendment rights.

66. As a direct and proximate result of Defendant Shaffer's unconstitutional conduct, Plaintiff has suffered economic damages, including lost wages and benefits; compensatory damages, including emotional pain and suffering;

15

and embarrassment and humiliation. Plaintiff is also entitled to recover her attorney's fees and costs as permitted by law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor against Defendants and order the following relief as allowed by law:

1. Permanently enjoining Defendants from engaging in said unlawful practices, policies, customs, and usages set forth herein and from continuing any and all other practices shown to be in violation of applicable law.
2. The award to Plaintiff of economic and compensatory damages based on Defendants' unlawful actions.
3. The award to Plaintiff of punitive damages against Defendants Shaffer and Fleming for their willful disregard of Plaintiff's constitutional rights.
4. The award to Plaintiff of attorney's fees and costs of this action.
5. The award to Plaintiff of prejudgment and post-judgment interest at the highest rate.
6. The award to Plaintiff of such other equitable relief as the Court may deem justified.

## JURY TRIAL DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Respectfully submitted this 22nd day of December, 2025.

**HKM Employment Attorneys LLP**

*s/Artur Davis*
Artur Davis (application for pro hac vice forthcoming)

(admitted in Alabama)
ASB-3672-D56A
2024 3rd Ave. North
Suite 212
Birmingham, AL 35203  205-881-0935  adavis@hkm.com

*s/Sunny Panyanouvong-Rubeck*
P. Sunny Panyanouvong-Rubeck

N.C. Bar No. 39966
3623 Latrobe Drive
Unit 122
Charlotte, NC 28211
980-300-6630
980-734-3851 (fax)  spanyanouvong-rubeck@hkm.com

**Attorneys for Plaintiff Janique Sanders**