# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### CIVIL ACTION NO: 3:25-CV-1017

| | |
|---|---|
| JANIQUE SANDERS,<br><br>        Plaintiff,<br><br>    v.<br><br>THE UNIVERSITY OF NORTH CAROLINA AT CHARLOTTE; KAREN SHAFFER; and FRANK FLEMING, in their individual capacities,<br><br>        Defendants. | **ANSWER OF THE UNIVERSITY OF NORTH CAROLINA AT CHARLOTTE AND KAREN SHAFFER** |

The University of North Carolina at Charlotte and Karen Shaffer by and through undersigned counsel, respond to the allegations contained in Plaintiff's Complaint as follows:

## <u>PRELIMINARY STATEMENT</u>

1. Plaintiff Sanders, an African-American woman, was once employed in the office of Identity, Equity, and Engagement at the University of North Carolina-Charlotte ("UNCC"). When the political pendulum in North Carolina and nationally swung in a different direction, Sanders' department was reorganized and parts of its mission were shuttered. Other aspects of what is commonly called "diversity, equity, and inclusion" ("DEI") work remained intact.

**ANSWER: Admitted that UNC-Charlotte employed Sanders in the Office of Identity, Equity, and Engagement from March 2021 to July 31, 2024. Upon information and belief, Sanders self-identifies as an African-American woman. Otherwise, denied.**

2. In the fall of 2024, a conservative advocacy group that calls itself Accuracy in Media ("AIM") targeted Sanders for one of its periodic "sting" videos, where unsuspecting employees are videotaped making comments that AIM believes reflect their employer's liberal agenda. Approximately six months later, AIM posted online its sting of Sanders commenting on the continued vitality of DEI work at UNCC, a purpose AIM despises.

**ANSWER: Admitted that AIM posted a video and Sanders confirmed that her appearance in the video was not AI generated. Defendants lack knowledge or information sufficient to form a belief about the intent of AIM or AIM's mission. Otherwise, denied.**

3. Within 24 hours, Sanders was fired by UNCC's Associate Vice Chancellor of Student Affairs Karen Shaffer and its Executive Director of Student Affairs Frank Fleming for her exercise of her rights as an American citizen to speak on a matter of controversy and public concern.

**ANSWER: Admitted that Karen Shaffer is the Associate Vice**

**Chancellor for Student Affairs. Admitted that Frank Fleming was the Executive Director of Student Affairs. Admitted that Shaffer informed Sanders that her employment was being terminated. Otherwise, denied.**

4. In this lawsuit, Sanders alleges under 42 U.S.C.A. § 1983 that her termination for free speech by Shaffer and Fleming violates the First Amendment of the United States Constitution. Sanders also asserts a cause of action under the mixed motive provision of Title VII of the Civil Rights Act of 1964 on the grounds that her firing reflects an impermissible injection of racial bias into an employment decision.

**ANSWER: Upon information and belief, Sanders is asserting 1983 claims against Shaffer and Fleming and a Title VII claim against UNC-Charlotte. Otherwise, denied.**

5. Sanders seeks economic damages against UNCC, Shaffer, and Fleming including back pay and front pay, as well as lost benefits; noneconomic compensatory damages; and attorneys' fees and costs of litigation.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief about the damages Sanders is seeking. Otherwise, denied.**

3

## PARTIES

6.      Sanders is a resident of the State of North Carolina and was at all times relevant to this complaint employed by UNCC.

**ANSWER:   Admitted that Sanders was employed by UNC-Charlotte from March 2021 to May 2025.  Upon information and belief, admitted that Sanders is a resident of the State of North Carolina.  Otherwise denied.**

7.      UNCC is a public university within the University of North Carolina system and is located in Mecklenburg County.

**ANSWER:  Admitted.**

8.      UNCC is subject to suit under Title VII for unlawful employment practices.

**ANSWER:  The allegation in Paragraph 8 is a legal conclusion to which no response is required.  To the extent a response is required, denied.**

9.      Defendant Shaffer is the Associate Vice Chancellor of Student Affairs of UNCC and was a decisionmaker regarding Sanders' termination. Shaffer is subject to suit in her individual capacity under § 1983 for a violation of Sanders' right to free speech under the First Amendment that was perpetrated under color of state law.

4

**ANSWER: Admitted that Shaffer is the Associate Vice Chancellor for Student Affairs. Admitted that Shaffer informed Sanders that her employment was being terminated. Otherwise, denied.**

10. Defendant Fleming is the Executive Director of UNCC's Office of Student Affairs and was a decisionmaker regarding Sanders' termination. Fleming is subject to suit in his individual capacity under § 1983 for a violation of Sanders' right to free speech under the First Amendment that was perpetrated under color of state law.

**ANSWER: Admitted that Fleming used to be the Executive Director of Student Affairs. Admitted that Fleming was present when Sanders was informed that her employment was being terminated. Otherwise, denied.**

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

11. Sanders filed a charge of race discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 430-2025-04470, on August 20, 2025.

**ANSWER: Upon information and belief, admitted that Sanders filed a charge with the EEOC. Otherwise, denied.**

5

12. Sanders subsequently received a Right-to-Sue letter from the EEOC on September 29, 2025. A copy is attached as Exhibit A.

**ANSWER: Upon information and belief, admitted.**

13. Sanders timely files her Title VII claim against UNCC within 90 days of receiving her Right-to-Sue letter.

**ANSWER: The allegation in Paragraph 13 is a legal conclusion to which no response is required. To the extent a response is required, denied.**

## JURISDICTION

14. The Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1343(a)(4) and 28 U.S.C. § 1331 (federal question).

**ANSWER: The allegation in Paragraph 14 is a legal conclusion to which no response is required. To the extent a response is required, denied.**

## VENUE

15. Pursuant to 28 U.S.C. § 1391(b)(1), the Western District of North Carolina is the proper venue for the filing and prosecution of this action in that Defendants in this case have a principal place of business in the

6

Western District of North Carolina and because the employment practices and other conduct alleged to be unlawful occurred in this district.

**ANSWER: The allegation in Paragraph 15 is a legal conclusion to which no response is required. To the extent a response is required, denied.**

<u>FACTUAL ALLEGATIONS</u>

16. Sanders grew up in Newark, New Jersey; after moving to the Charlotte area in 2011, she attended UNCC for one year. She transferred to Rutgers University where she graduated Phi Beta Kappa in 2017. She is a member of the Alpha Kappa Alpha sorority and obtained a masters of Public Administration at Rutgers in 2019.

**ANSWER: Upon information and belief, Sanders attended UNC-Charlotte as an undergraduate student during the Fall 2012 and Spring 2013 semesters, graduated from Rutgers University in 2017, and graduated with a Masters in Public Administration from Rutgers University in 2019. Defendants lack knowledge or information sufficient to form a belief about where Sanders grew up, where she worked, and whether she was a member of a sorority. Otherwise, denied.**

7

17. Sanders spent two years working at Rutgers in the broad field of equity and outreach to campus communities. Her various roles included facilitating interactive dialogue on social justice concerns, advising student affinity groups, and supervising teams of federal work study students.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief about Sanders's roles and responsibilities during any prior employment. Otherwise, denied.**

18. In March 2021, Sanders returned to Charlotte and joined UNCC's office of Identity, Equity, and Engagement. ("IEE"). She was named UNCC's Assistant Director of Experiential and Equity Initiatives.

**ANSWER: Admitted that on March 16, 2021 Sanders started working at UNC-Charlotte in the Office of Identity, Equity and Engagement and her title was Assistant Director - IEE. Otherwise, denied.**

19. Sanders' job focused on institutional programs that sought to engage students who were part of marginalized economic, ethnic, and social communities. The goal was to replace alienation and conflict with a sense of shared community.

**ANSWER: Admitted that Sanders was employed by UNC-Charlotte from March 2021 to May 2025. Otherwise, denied.**

20. Sanders was part of UNCC's umbrella of DEI initiatives, which emerged in the aftermath of a racially turbulent time in American history: notorious incidents in which two Black Americans, Breonna Taylor and George Floyd, were victims of what were widely regarded as excessive and disproportionate uses of deadly force by law enforcement.

**ANSWER: Admitted that Sanders was employed by UNC-Charlotte from March 2021 to May 2025. Defendants deny the remaining allegations as immaterial and irrelevant to the claims asserted in this action.**

21. For a brief season, the UNC system's DEI agenda was a subject of bipartisan and corporate praise and aligned with a national trend of expanding closed circles of leadership: black women were elevated to the United States Supreme Court and the position of Vice President of the United States, and scores of persons of color and diverse social identities were appointed to the federal judiciary.

**ANSWER: Admitted that the UNC System had a Regulation on Diversity and Inclusion from September 2019 until May 2024. Defendants deny the remaining allegations as immaterial and irrelevant to the claims asserted in this action.**

22. The tide moved dramatically in a different direction in 2023 and 2024 in North Carolina and the country. The University of North Carolina's

9

policy of treating racial diversity as a positive factor in its admissions calculus was struck down by the Supreme Court. That ruling and a companion decision against Harvard University spawned a genre of imitator lawsuits aimed at attacking hiring practices in the private sector, the award of racially themed grants and scholarship to students and entrepreneurs, and even the admissions process at America's military academies.

**ANSWER: To the extent this paragraph contains allegations related to legal opinions issued by the United States Supreme Court, those opinions are written documents that speak for themselves, and Defendants deny any representations that are inconsistent with those opinions. Defendants deny any remaining allegations as immaterial and irrelevant to the claims asserted in this action.**

23. The UNC system's Board of Governors voted in May 2024 to repeal its official DEI policy and to replace it with a vaguely described stance of "institutional neutrality" regarding the value of racial diversity. In the same vein, the Board issued guidance to its administrators that offices and programs that promoted DEI initiatives needed to be closed.

**ANSWER: Admitted that the UNC System repealed the Regulation on Diversity and Inclusion in May of 2024. Admitted that the UNC System issued guidance indicating that**

its policy prohibits **"without limitation, diversity, equity, and inclusion offices and officers." Otherwise, denied.**

24. Sanders' IEE department was one of the programs targeted for closure. UNCC replaced IEE with a newly minted Center for Leadership and Community Engagement ("CLCE"). Sanders' specific role was rebranded as Assistant Director of Civic Engagement and Experiential Learning.

**ANSWER: Admitted that UNC-Charlotte eliminated the Office of Identity, Equity, and Engagement as of July 31, 2024. Admitted that in August 2024 Sanders became the Assistant Director of Civic Engagement and Experiential Learning. Otherwise, denied.**

25. Sanders' department, despite its former mission, was primarily staffed and led by white employees who retained their role and a white female rather than Sanders was named to the new position of Associate Director of CLCE.

**ANSWER: Admitted that in August 2024 Sanders worked in Leadership and Community Engagement and her title was Assistant Director of Civic Engagement and Experiential Learning. Admitted that in August 2024 Leadership and Community Engagement employed at least three white women, two Hispanic women, a Black man, two white men, and a Black**

**woman. Otherwise, denied.**

26. Sanders was not in any manner a policy maker and had no formal or informal responsibility for conceiving CLCE's mission or its legitimate scope of duties in the aftermath of the anti DEI backlash.

**ANSWER: Given that Leadership and Community Engagement existed before Sanders began working for that department, she did not have any role in conceiving of its mission or duties. Otherwise, denied.**

27. The leadership of Sanders' department expressed in internal meetings a desire to preserve core aspects of its prior mission without running afoul of the Board of Governors' anti-DEI mandate. In Sanders' case, while she was no longer permitted to act as a liaison to campus groups organized based on social or ethnic identity, she was permitted to continue off campus collaborations with organizations that aligned with social justice and to devote time and resources to subjects of economic empowerment and civic participation.

**ANSWER: Denied.**

28. In the October/November 2024 time frame, while working in her office, Sanders was approached by two individuals, one of whom was white and the other was white or Hispanic, who inquired about available job opportunities in her department. They expressed that they wanted to work

specifically on DEI initiatives.

**ANSWER: Upon information and belief, admitted that two individuals approached Sanders in the Student Union where Sanders worked, during business hours, and asked about DEI employment opportunities at UNC-Charlotte. Otherwise, denied.**

29. Sanders became involved in a conversation with these individuals that lasted between five and ten minutes. She told them that DEI was no longer a recognized programmatic space at UNCC. Sanders sought instead to steer them to pursuing opportunities related to community service projects, for example a partnership between UNCC and Charlotte food banks.

**ANSWER: Upon information and belief, Sanders spoke with these individuals. Defendants lack knowledge or information sufficient to form a belief regarding the remaining allegations, and therefore, deny them.**

30. Sanders went on to express her personal viewpoint that while DEI had been abandoned as a matter of policy in the UNC system, its original values ought to remain vital parts of campus life. As she put it at one point, "We've renamed…reorganized..recalibrated..because language changes, right? But the people who have to be in the presence of and in the space don't change."

13

**ANSWER: Sanders's statements in the video are recorded and have been transcribed and speak for themselves. Defendants deny any alleged statement that is inconsistent with the recording or transcript. Otherwise, denied.**

31. Sanders continued by stating that she believed what one of the individuals labeled "equity work" was still happening at UNCC but that she believed she "was not allowed" to overtly say so. She further expressed her opinion that knowledge of diverse communities should remain a central tool of leadership and was integrally connected to ensuring a constructive learning environment for students.

**ANSWER: Sanders's statements in the video are recorded and have been transcribed and speak for themselves. Defendants deny any alleged statement that is inconsistent with the recording or transcript. Otherwise, denied.**

32. In November 2024, Donald J. Trump was elected President of the United States for the second time, defeating the black female Vice President Kamala Harris. Trump's relatively thin margin in the popular vote translated to a resounding win in the Electoral College, including a victory in North Carolina, a state that former President Barack Obama had won a political generation earlier.

**ANSWER: Defendants deny the allegations as immaterial and**

irrelevant to the claims asserted in this action.

33. President Trump unfurled a fusillade of executive orders in his first weeks back in the White House. One of them officially eradicated federal DEI policies and prohibited educational institutions from engaging in DEI work. The President has overhauled the leadership and agenda of various federal civil rights agencies and his Department of Justice has pursued and threatened to pursue federal lawsuits against organizations who continue to promulgate policies that endorse the strengthening of racial diversity.

**ANSWER: Upon information and belief, the Federal Register publishes executive orders. Defendants deny any allegation that is inconsistent with the published executive orders. Defendants deny any remaining allegations as immaterial and irrelevant to the claims asserted in this action.**

34. On the evening of May 28, 2025, Sanders received a text message from Karen Shaffer, UNCC's Associate Vice Chancellor of Student Affairs, with a link to a video and audio recording that had been posted that same day on social media by an organization that labels itself Accuracy in Media.

**ANSWER: Admitted that Shaffer texted Sanders on May 28, 2025 regarding the AIM video and the content of the text message is a written document that speaks for itself. Defendants lack knowledge or information sufficient to form a**

**belief regarding when the video was posted. Otherwise, denied.**

35. The video contained selective excerpts of the aforementioned conversation between Sanders and two individuals who purported to seek jobs in Sanders' department in October or November 2024. It turns out that these supposed job seekers were operatives for AIM who had recorded the exchange on their phones without Sanders' consent.

**ANSWER: Upon information and belief, admitted that two individuals approached Sanders in the Student Union where Sanders worked, during business hours, and asked about DEI employment opportunities at UNC-Charlotte. Upon information and belief, Sanders did not know that she was being recorded. Defendants lack knowledge or information sufficient to form a belief regarding whether these individuals were operatives, how they recorded the video, and the extent to which the conversation was excerpted. Otherwise, denied.**

36. AIM does not practice UNC's current stance of "institutional neutrality" on subjects of racial controversy. AIM has launched a campaign to secretly record campus administrators endorsing DEI values in an effort to foment opposition to any vestiges of advocacy of racial diversity; rather than follow the ethical imperative that journalists reveal themselves and their

16

news outlets, AIM's sting operatives pretend to be empathetic citizens soliciting their target's views.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief regarding the allegations about AIM. To the extent a response is required, denied.**

37. AIM has not shown in its decades long history any comparable zeal or interest in targeting for exposure individuals who harbor racist or misogynistic views.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief regarding the allegations about AIM. To the extent a response is required, denied.**

38. AIM and its ideological counterparts regard racial diversity as a device to elevate racial minorities in the workforce at the expense of whites. That belief, in turn, is often informed by an assumption that the rise of minorities in leadership roles is unconnected to merit and derives instead from an unfair edge in the form of quotas.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief regarding the allegations about AIM. To the extent a response is required, denied.**

39. Sanders verified to Associate Vice Chancellor Shaffer that the images in the video were not AI generated or fabricated. Later that evening,

17

Shaffer called Sanders a second time to inform her that UNCC would need to conduct an investigation of the circumstances around the recording.

**ANSWER: Admitted that Sanders informed Shaffer that the images in the video were not AI generated. Admitted that Shaffer and Sanders spoke on the phone. It is also admitted that Sanders texted Shaffer "Whatever the repercussions there are I humbly accept." Otherwise, denied.**

40. The next day, May 29, instead of being questioned by an internal investigator, Sanders was informed by Shaffer and Frank Fleming, the Executive Director of UNCC's Division of Student Affairs, that they had decided to immediately terminate her.

**ANSWER: Admitted that on May 29, 2025, Shaffer and Fleming called Sanders and Shaffer informed her that her employment with UNC-Charlotte was ending. Admitted that Fleming was the Executive Director of Student Affairs. Otherwise, denied.**

41. Sanders was not provided with specific grounds for her firing and Shaffer and Frank did not articulate to her any provision of UNCC's policies that Sanders violated.

**ANSWER: Admitted that on May 29, 2025, Shaffer and Fleming called Sanders and informed her that her employment with UNC-Charlotte was ending. Otherwise, denied.**

42. In a press interview, a communications official at UNCC acknowledged that Sanders "had no policy making authority, no role in compliance matters", and that her comments in the AIM video were not made within the purview of her job.

**ANSWER: Denied that UNC-Charlotte made any statement regarding whether Sanders comments were made "within the purview of her job." The language Sanders quotes in this paragraph comes from a written statement that speaks for itself, and Defendants deny any representations that are inconsistent with the written statement. Otherwise, denied.**

43. While UNCC's spokesperson alluded to an internal review that preceded Sanders' firing, the "review" lacks any hallmarks of genuine investigation. Sanders was not interviewed or asked to provide a defense or rationale for her taped comments.

**ANSWER: Admitted that UNC-Charlotte stated that there was an internal review. Otherwise, denied.**

44. Upon information and beliefs, UNCC did not seek and has never obtained the entire footage of AIM's recording of Sanders. While it is unknown to Sanders whether UNCC interviewed her supervisors or the leadership in her department about whether their views align with Sanders, UNCC's public comments have only stated that the university would endeavor

to ensure its employees followed federal law.

**ANSWER: Admitted that UNC-Charlotte is not in possession of the footage AIM recorded. Defendants lack knowledge or information sufficient to form a belief regarding Sanders's knowledge. UNC-Charlotte's public comments are written statements that speak for themselves, and Defendants deny any representation inconsistent with those statements. Otherwise, denied.**

45. There is no evidence or reporting that suggests that UNCC attempted to ascertain whether other non-black officials in Sanders' department have made comments similar to Sanders' viewpoint or to determine the forum in which any similar comments were made; or that UNCC analyzed whether AIM's conduct itself reflects a racially biased agenda.

**ANSWER: Admitted that UNCC did not attempt to analyze AIM's conduct. Otherwise, denied.**

46. Race was at least a motivating factor in UNCC's termination of Sanders, in that the university ratified or condoned AIM's actions that are at least partially ringed by racially biased assumptions.

**ANSWER: Denied.**

47. It is atypical at UNCC to terminate individuals with no

disciplinary history for a first offense violation of policy, assuming without proof that UNCC actually believed Sanders violated a concrete campus policy or rule.

**ANSWER: Denied.**

## CAUSES OF ACTION

### COUNT I
**(against Defendant University of North Carolina-Charlotte)**
**(mixed motive discrimination in violation of 42 U.S.C. §§ 2000e-2(m))**

48. Plaintiff realleges and incorporates the factual allegations herein as if set forth in their entirety.

**ANSWER:  Defendants incorporate their responses to all other paragraphs as if set forth in their entirety.**

49. UNCC's termination of Plaintiff gave impermissible weight to the actions of an external entity that were driven in part by opposition to racial diversity initiatives on behalf of Black Americans.

**ANSWER: Denied.**

50. UNCC's termination also singled out Sanders without endeavoring to determine if the viewpoints she expressed reflected the perspective of other employees in her academic program who were outside of her protected class.

**ANSWER: Denied.**

21

51. As a result, UNCC's actions reflect the impermissible consideration of race as a motivating factor in the decision to terminate Sanders.

**ANSWER: Denied.**

52. As a result of UNCC's discriminatory conduct, Plaintiff has suffered economic damages, including lost wages and benefits; compensatory damages, including emotional pain and suffering; and embarrassment and humiliation. Plaintiff is also entitled to recover her attorney's fees and costs as permitted by law.

**ANSWER: Denied.**

## COUNT II

**(against Karen Shaffer, in her individual capacity)**
**(First Amendment Retaliation, in violation of 42 U.S.C.A. § 1983)**

53. Plaintiff realleges and incorporates the factual allegations herein as if set forth in their entirety.

**ANSWER: Defendants incorporate their responses to all other paragraphs as if set forth in their entirety.**

54. Plaintiff's expression of views championing the continued necessity for diversity, equity, and inclusion policies at UNCC were spoken outside the scope of her job and scope of authority.

**ANSWER: Denied.**

55. Plaintiff's comments impinged on a matter of public concern, the ongoing debate over the legality as well as the social and economic value of racial diversity in educational institutions.

**ANSWER: Denied.**

56. Shaffer's failure to articulate a rule violation on Plaintiff's part or an actual breach of the Board of Governors' anti-DEI directives indicate that UNCC's legitimate interests did not outweigh Plaintiff's constitutional interest in free speech.

**ANSWER: Denied.**

57. Plaintiff's exercise of her free speech rights was a but-for cause of her termination by Defendant Shaffer.

**ANSWER: Denied.**

58. Defendant Shaffer's unconstitutional acts occurred under color of state law, were within the exercise of her discretionary authority, and violated Plaintiff's clearly established right to be free from retaliation for the exercise of her First Amendment rights.

**ANSWER: Denied.**

59. As a direct and proximate result of Defendant Shaffer's unconstitutional conduct, Plaintiff has suffered economic damages, including lost wages and benefits; compensatory damages, including emotional pain and

suffering; and embarrassment and humiliation. Plaintiff is also entitled to recover her attorney's fees and costs as permitted by law.

**ANSWER:  Denied.**

## COUNT III
**(against Frank Fleming, in his individual capacity)**
**(First Amendment Retaliation, in violation of 42 U.S.C.A. § 1983)**

60.    Plaintiff realleges and incorporates the factual allegations herein as if set forth in their entirety.

**ANSWER:  Defendants incorporate their responses to all other paragraphs as if set forth in their entirety.**

61.    Plaintiff's expression of views championing the continued necessity for diversity, equity, and inclusion policies at UNCC were spoken outside the scope of her job and scope of authority.

**ANSWER: This allegation is not directed to Defendants.  To the extent a response is required, denied.**

62.    Plaintiff's comments impinged on a matter of public concern, the ongoing debate over the legality as well as the social and economic value of racial diversity in educational institutions.

**ANSWER:  This allegation is not directed to Defendants.  To the extent a response is required, denied.**

63.    Fleming's failure to articulate a rule violation on Plaintiff's part

or an actual breach of the Board of Governors' anti-DEI directives indicate that UNCC's legitimate interests in efficient administration did not outweigh Plaintiff's constitutional interest in free speech.

**ANSWER: This allegation is not directed to Defendants. To the extent a response is required, denied.**

64. Plaintiff's exercise of her free speech rights was a but-for cause of her termination by Defendant Fleming.

**ANSWER: This allegation is not directed to Defendants. To the extent a response is required, denied.**

65. Defendant Fleming's unconstitutional acts occurred under color of state law, were within the exercise of his discretionary authority, and violated Plaintiff's clearly established right to be free from retaliation for the exercise of her First Amendment rights.

**ANSWER: This allegation is not directed to Defendants. To the extent a response is required, denied.**

66. As a direct and proximate result of Defendant Shaffer's unconstitutional conduct, Plaintiff has suffered economic damages, including lost wages and benefits; compensatory damages, including emotional pain and suffering; and embarrassment and humiliation. Plaintiff is also entitled to recover her attorney's fees and costs as permitted by law.

**ANSWER: This allegation is not directed to Defendants. To the**

25

**extent a response is required, denied.**

## GENERAL DENIAL

**TO THE EXTENT THAT DEFENDANTS HAVE FAILED TO SPECIFICALLY ADMIT ANY ALLEGATION IN THE AMENDED COMPLAINT TO WHICH A RESPONSE IS REQUIRED, SUCH ALLEGATION IS HEREBY EXPRESSLY DENIED. DEFENDANTS FURTHER DENY ALL MATTERS UPON WHICH THEY PRESENTLY LACK SUFFICIENT INFORMATION TO ANSWER.**

## ADDITIONAL DEFENSES

As to the Complaint, Defendants aver the following defenses:

## FIRST DEFENSE

Defendants had legitimate, non-discriminatory reasons for terminating Plaintiff's employment.

## SECOND DEFENSE

Plaintiff's race was not a factor in the termination decision.

## THIRD DEFENSE

The individual defendants are entitled to qualified immunity.

## FOURTH DEFENSE

Plaintiff was an at-will employee.

## FIFTH DEFENSE

The decisionmaker identifies as African American like the Plaintiff.

## SIXTH DEFENSE

26

Defendants deny that Plaintiff is entitled to any damages. Furthermore, Plaintiff, with the exercise of reasonable diligence and effort, could have mitigated the damages alleged in the Complaint. Therefore, any such damages were directly and proximately caused by the Plaintiff's failure, neglect and refusal to exercise reasonable diligence to mitigate the damages alleged and Plaintiff is barred from any recovery.

## DEMAND FOR JURY TRIAL

Please take notice that Defendants demand a jury trial in this action.

**WHEREFORE**, Defendants pray the Court as follows:

1.      That Plaintiff's Complaint and all claims therein be dismissed with prejudice;

2.      That Plaintiff have and recover nothing from Defendants in this action;

3.      That the costs of this action, including reasonable attorney's fees, be taxed to Plaintiff as allowed by law;

4.      For such other and further relief as the Court deems just and proper; and

5.      For a trial by jury of all issues of fact herein.

Respectfully submitted this 3rd day of March, 2026

JEFF JACKSON
Attorney General


/s/ Kenzie M. Rakes
Kenzie M. Rakes
Special Deputy Attorney General
NC State Bar No. 46349
krakes@ncdoj.gov

North Carolina Department of
Justice
PO Box 629
Raleigh, NC  27602
Tel: 919-716-60085
Fax: 919-716-6764

*Attorney for Defendants*

28

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing **ANSWER OF THE UNIVERSITY OF NORTH CAROLINA AT CHARLOTTE AND KAREN SHAFFER** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all registered CM/ECF users, addressed as follows:

Artur Davis
adavis@hkm.com

P. Sunny Panyanouvong-Rubeck
spanyanouvong-rubeck@hkm.com

This 3rd day of March, 2026.

 /s/ Kenzie M. Rakes
Kenzie M. Rakes
Special Deputy Attorney General